UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

RICHARD JAROSZ, CAROLE ARCHAMBEAULT,
EUGENIA BELLERE, ROBERT BRANDON,
JOHN CZECH, GERALD DIXON, ROBIN GLOVER,
PATRICK HIGGINS, WALLACE JAROSZEWSKI,
TODD KENDZIERSKI, DONNA LICHTENTHAL,
MICHAEL LoGRASSO, WILLIAM McDONELL,
ROBERT OSBORNE, ANNE OSIKA,
KATHY PERKOVICH, TAMMY SANTANA,
GAIL SCHALBERG, WILLIAM SEVERINO,
JAMES SHORT, MICHAEL STOWELL,
KENNETH ZIOLKOWSKI, and SUSAN WISE,

                        Plaintiffs,

        v.                                              **DECISION AND ORDER**
                                                        12-CV-39S
AMERICAN AXLE & MANUFACTURING, INC.,
HOURLY-RATE ASSOCIATES PENSION PLAN, and
AMERICAN AXLE & MANUFACTURING, INC.,

                        Defendants.


## I. INTRODUCTION

        In this action, the plaintiffs, each of whom is a qualified participant in the Defendant

American Axle & Manufacturing, Inc. Hourly-Rate Associates Pension Plan ("the Plan"),

allege that Defendants violated the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001 et seq. by reducing their pension payments due under the

Plan by the amount of certain workers' compensation payments they received. They

also assert related causes of action.

        Presently before this Court are the parties' cross motions for summary judgment.

(Docket Nos. 61, 62.) For the reasons that follow, the motions are granted in part and

denied in part.

## II. BACKGROUND

### A. Facts[1]

#### 1. The Plaintiffs

The plaintiffs were all members of The International Union, United Automobile, Aerospace and Agricultural Implement Workers of America ("UAW") at the time they retired from Defendant American Axle & Manufacturing, Inc. ("American Axle"). (Plaintiffs' Statement of Facts Not in Genuine Dispute ("Plaintiffs' Statement"), Docket No. 62-9, ¶¶ 1, 46.) Some plaintiffs previously worked for General Motors Corporation ("GM") before continuing on with American Axle after it bought two of GM's plants in March 1994—Bellere, Brandon, Czech, Glover, Jaroszewski, Lichtenthal, LoGrasso, McDonell, Schalberg, Short, and Wise—while the others worked only for American Axle after its purchase of the plants—Jarosz, Archambault, Dixon, Higgins, Kendzierski, Osborne, Osika, Perkovich, Santana, Severino, Stowell, and Ziolkowski.[2] (Plaintiffs' Statement, ¶¶ 3, 45; Defendants' Statement of Undisputed Facts ("Defendants' Statement"), Docket No. 61-68, ¶¶ 11, 12, 17, 18, 23, 32, 50, 61, 68, 75, 76, 82, 87, 88, 95, 101, 111, 121, 122, 127, 128, 133, 134, 139, 140, 147, 152, 153, 158, 167, 168, 176, 177.)

Both GM and American Axle provided pension plans to their employees negotiated as part of various collective bargaining agreements. (Plaintiffs' Statement, ¶¶ 2, 4-12;

---

1 Unless otherwise noted, the facts are undisputed.

2 Plaintiffs Dixon, Higgins, and Lichtenthal are deceased. (Defendants' Statement, ¶¶ 67, 81, 100; Defendants' Response, ¶ 45.)

Defendants' Response to Plaintiffs' Statement of Facts Not in Genuine Dispute ("Defendants' Response"), Docket No. 66-1, ¶¶ 2, 4-12.)   While the parties disagree as to the relevance and impact of those agreements (see id.), they agree that the pension plan at issue here is the "Restatement of the American Axle & Manufacturing, Inc. Hourly-Rate Associates Pension Plan" (again, "the Plan"), which is found in the record at docket numbers 61-4 and 61-5.   (Plaintiffs' Statement, ¶ 13; Defendants' Response, ¶¶ 13, 21.) The parties further agree that the language of the Plan provision at issue—Deductions for Workers Compensation—has not changed throughout the various agreements between American Axle and the UAW between 1994 and 2008.   (Plaintiffs' Statement, ¶¶ 10, 14-16, 25; Defendants' Response, ¶¶ 10, 14-16, 25.)

### 2.  The Plan

There is no dispute that the Plan is an employee pension benefit and defined benefit plan under ERISA.   (Defendants' Statement, ¶ 1; Plaintiffs' Statement, ¶ 43.) American Axle has been the sponsor and administrator of the Plan since 1994. (Defendants' Statement, ¶¶ 2, 3; Plaintiffs' Statement of Disputed Facts ("Plaintiffs' Response"), Docket No. 65-1, ¶ 3; Plaintiffs' Statement, ¶¶ 27, 44; Defendants' Response, ¶ 27.)   American Axle delegated day-to-day administration of the Plan to GM from 1994 to 1997, after which it undertook direct administration of the Plan itself. (Plaintiffs' Statement, ¶ 27; Defendants' Response, ¶ 27.)

American Axle administers the Plan through a Management Benefits Committee ("MBC") and funds it with irrevocable contributions to a trust fund, which is managed by a third-party trustee—SEI Private Trust Company.   (Defendants' Statement, ¶¶ 4-6;

Plaintiffs' Response, ¶ 4; Plaintiffs' Statement, ¶ 22; Defendants' Response, ¶ 22.)   The

MBC is comprised of American Axle executives.   (Plaintiffs' Statement, ¶ 22; Defendants'

Response, ¶ 22.)

The Plan vests the MBC with

> discretionary authority to determine all questions arising in the
> administration, application and interpretation of the Plan
> including the authority to correct any defect or reconcile any
> inconsistency or ambiguity in the Plan and the authority to
> determine a Participant's, beneficiary's or other individual's
> right to participate in the Plan, eligibility to receive a benefit
> from the Plan, and the amount of that benefit.

(Defendants' Statement, ¶ 4; Plaintiffs' Response, ¶ 4; Plaintiffs' Statement, ¶ 22;

Defendants' Response, ¶ 22.)

At issue is the provision of the Plan that governs how receipt of workers'

compensation payments affects monthly benefits payable under the Plan.   (Plaintiffs'

Statement, ¶ 17; Defendants' Response, ¶ 17.)   That provision provides as follows:

> **Deductions for Workers Compensation**.   In determining
> the monthly benefits payable under this Plan, a deduction
> shall be made unless prohibited by law, equivalent to all or
> any part of Workers Compensation (including compromise or
> redemption settlements) payable to such associate by reason
> of any law of the United States, or any political subdivision
> thereof, which has been or shall be enacted, provided that
> such deductions shall be to the extent that such Workers
> Compensation has been provided by premiums, taxes or
> other payments paid by or at the expense of the Corporation,
> except that no deduction shall be made for the following:
>
> > (a) Workers   Compensation   payments   specifically
> > allocated for hospitalization or medical expenses, fixed
> > statutory payments for the loss of any bodily member,
> > or 100% loss of use of any bodily member, or payments
> > for loss of industrial vision.

<div style="margin-left: 2em;">

(b) Compromise or redemption settlements payable prior to the date monthly pension benefits first become payable.

(c) Workers Compensation payments paid under a claim filed not later than two years after the breaking of seniority.

</div>

(Defendants' Statement, ¶ 8.)

The parties agree that for purposes of subsection (c), retirement constitutes a break of seniority under the Plan.   (Plaintiffs' Statement, ¶ 18; Defendants' Response, ¶ 18.)

### 3.  Defendants' Decision to Deduct Workers' Compensation Payments from Pension Payments

Each plaintiff filed a workers' compensation claim before they retired from American Axle.   (Plaintiffs' Statement, ¶ 47.)   And each plaintiff, at one point or another, received his or her resulting workers' compensation payments and his or her pension payments simultaneously without any offset.   (Plaintiffs' Statement, ¶ 48.)

In December 2005, Plaintiff Susan Wise began receiving monthly pension payments under the Plan.   (Defendants' Statement, ¶ 190.)   At that same time, Wise was also receiving workers' compensation payments from a claim that she filed before she retired from American Axle.   (Defendants' Statement, ¶ 185.)

About seven months later, on July 10, 2006, American Axle sent Wise a letter indicating that it would begin offsetting her monthly pension payment by the full amount of her monthly workers' compensation payment in line with the "Deductions for Workers Compensation" provision set forth above.[3]   (Defendants' Statement, ¶ 191; Letter to

---

3 American Axle also demanded the return of $8,366 that it believed it had overpaid Wise since December

Susan Wise, Docket No. 61-37.)   The letter did not inform Wise of her right to appeal American Axle's decision or describe the available appeal procedures.   (Plaintiffs' Statement, ¶ 30; Defendants' Response, ¶ 30; Letter to Susan Wise, Docket No. 61-37.)

Because Wise's monthly workers' compensation payment exceeded her monthly pension payment, she received no pension payments under the Plan, but she continued to receive all other benefits available to her, such as health, dental, vision, and life insurance.   (Defendants' Statement, ¶¶ 191, 192.)   When Wise's workers' compensation case was closed in 2007 and she stopped receiving monthly workers' compensation payments, American Axle reinstated the full amount of her monthly pension payments under the Plan.   (Defendants' Statement, ¶¶ 193, 194; Plaintiffs' Statement, ¶ 31.)

As a result of Wise's case, the UAW became aware in August 2006 that American Axle was interpreting the "Deductions for Workers Compensation" provision to require an offset for workers' compensation payments received from workers' compensation claims filed before a Plan participant retired.   (Defendants' Statement, ¶ 196.)   Before that time, American Axle had never applied such an offset.

In early 2009, American Axle audited all Plan participants to identify those who were receiving monthly pension payments and workers' compensation payments from claims filed before their retirement (i.e., prior to the breaking of seniority).   (Defendants' Statement, ¶ 197.)   It then notified the UAW on March 12, 2009, that, effective April 1,

_____
1, 2005.  (Letter to Susan Wise, Docket No. 61-37.)   Wise returned these payments.  (Plaintiffs' Statement, ¶ 30.)

2009, it would begin offsetting pension payments in the amount of workers' compensation payments under the "Deductions for Workers Compensation" provision of the Plan. (Defendants' Statement, ¶ 198.)

Thereafter, on March 23, 2009, American Axle sent letters to each plaintiff (and others) notifying them that, effective April 1, 2009, their pension payments under the Plan would be offset by the amount of any workers' compensation payments they received. (Defendants' Statement, ¶ 199; Plaintiffs' Statement, ¶ 35.) The letter sent to lead plaintiff Richard Jarosz is illustrative of the form letter American Axle sent to each plaintiff:

DEAR RICHARD JAROSZ:

You have been identified as currently receiving Worker's Compensation benefits. This information was provided by the Workers Compensation Department and verified by Sedgwick that you are in receipt of such Workers Compensation benefits and are not currently receiving Extended Disability benefits.

Per [sic] Article V Section 5.2 of the American Axle & Manufacturing, Inc. Hourly-rate Associate Pension Plan reads in relevant part regarding *"Deduction for Workers Compensation.["] In determining the monthly benefits payable under this Plan, a deduction shall be made . . . equivalent to all or any part of Workers Compensation payable to such associate . . . provided that such deductions shall be to the extent that such Workers Compensation has been provided by premiums, taxes or other payments paid by or at the expense of the Corporation . . . "*

Effective 4/1/2009, the full off-set of your Workers' Compensation was applied and your AAM pension payment will be $0.00. You are currently receiving $400.00 gross benefit payment each week for Workers Compensation. This converts to $1733.33 per month, which exceeds your gross AAM monthly pension benefit of $511.93.

Once you are no longer receiving Workers Compensation benefit payments, your monthly AAM pension benefits will be reinstated.

If you have any questions, you may contact Maureen Van Riper, Workers Compensation Manager, at (313) 758-4934.

Sincerely yours,
AMERICAN AXLE & MANUFACTURING, INC.
DEFINED BENEFIT PENSION ADMINISTRATION

(Letter to Richard Jarosz, Docket No. 61-7; Defendants' Response, ¶ 35.)

These letters did not comply with the relevant provisions of § 8.9 (b) of the Plan, which provides that upon denial of a claim, American Axle must provide written or electronic notice of the following information, written in a manner calculated to be understood by the claimant:

> (1) the specific reason or reasons for denial;
>
> (2) specific reference to pertinent Plan provisions on which the denial is based;
>
> (3) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
>
> (4) an explanation of the Plan's claim review procedures and the time limits applicable to such procedures including a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of, all documents, records and other information relevant to the claimant's claim for benefits;
>
> (5) a statement of the claimant's right to bring a civil action under Section 502 (a) of the [ERISA] following an adverse benefit determination on review
>
> . . .

(Plaintiffs' Statement, ¶ 37; Defendants' Response, ¶ 37; Plan, Docket No. 61-5, p. 14[4].)

Elizabeth Main wrote these letters (and Wise's letter) on American Axle's behalf.

(Plaintiffs' Statement, ¶ 37; Defendants' Response, ¶ 37; Deposition of Elizabeth Main

---

4 All page citations herein are to the page numbers generated by the court's CM/ECF filing system.

("Main Dep."), Docket No. 62-4, pp. 83, 85.) At the time, Main worked for American Axle as a coordinator in its retirement plan services department. (Main Dep., Docket No. 62-4, p. 78.) Main admitted at her deposition that she omitted from the letters certain information required by § 8.9 (b) of the Plan to keep the letters "short and succinct and to one page . . . [because] [p]eople tend to read things if it's only one page." (Id. at pp. 84, 86.)

### 4. Plaintiffs' Administrative Appeal

The UAW challenged American Axle's decision on Plaintiffs' behalf, arguing that workers' compensation payments received from claims filed before the breaking of seniority could not be used to offset pension payments due under the Plan because those claims were necessarily filed "not later than two years after the breaking of seniority." (Defendants' Statement, ¶ 200; Plaintiffs' Statement, ¶ 200; Letter from UAW to the Plan, Docket No. 61-40.)

The MBC considered the UAW's challenge as an appeal of its decision and denied it on November 9, 2009, explaining that, in its discretion under the Plan, it had "determined that retirees that receive Workers Compensation payments from claims filed prior to the breaking of seniority shall have such payments offset from pension benefits payable under the Plan." (Defendants' Statement, ¶ 203; Letter from MBC to UAW, Docket No. 61-42.) American Axle then rejected the UAW's request for further administrative review. (Defendants' Statement, ¶¶ 205, 206; Plaintiffs' Statement, ¶ 206; Plaintiffs' Statement, ¶¶ 40, 41; Defendants' Response, ¶¶ 40, 41; Letter from UAW to the Plan, Docket No. 61-43; Letter from American Axle to UAW, Docket No. 61-44.) All administrative review

9

concluded by April 4, 2011. (Letter from American Axle to UAW, Docket No. 61-44.)

**B. Procedural History**

Plaintiffs timely filed their civil suit under ERISA in this court on January 17, 2012. (Docket No. 1.) Defendants filed their answer on March 23, 2012.[5] (Docket No. 9.) This matter was then referred to the magistrate judge to conduct all pretrial proceedings. (Docket No. 11.) Upon the conclusion of proceedings before the magistrate judge, the parties filed cross-motions for summary judgment on February 19, 2016. (Docket Nos. 61, 62). Briefing on the parties' motions, including supplemental briefing, concluded on July 1, 2016, at which time this Court reserved decision without oral argument.

## III. DISCUSSION

Plaintiffs assert four causes of action in their corrected complaint. First, they allege that Defendants violated ERISA by reducing their pension payments by the amount of certain workers' compensation payments they received. (Corrected Complaint, Docket No. 15, ¶¶ 204-216.) Second, they assert a promissory estoppel claim under ERISA. (Corrected Complaint, ¶¶ 217-227.) Third, they allege that Defendants failed to provide a reasonable claims procedure under ERISA, entitling them to *de novo* review. (Corrected Complaint, ¶¶ 228-231.) And fourth, they seek equitable relief under ERISA in the form of a declaratory judgment. (Corrected Complaint, ¶¶ 232-233.) Before moving to these claims, two general issues must be resolved.

First, as all parties have acknowledged in the record, Plaintiffs Dixon, Higgins, and

---

5 Plaintiffs later filed a corrected complaint on April 11, 2012, which Defendants answered on April 13, 2012. (Docket Nos. 15, 16.) The corrected complaint only added a page that was inadvertently omitted from the original complaint due to a scanning error. (See Docket No. 15.)

Lichtenthal died during the pendency of this action. (Defendants' Statement, ¶¶ 67, 81, 100; Plaintiffs' Response, ¶¶ 67, 81, 100; Defendants' Response, ¶ 45.) When a party dies during the pendency of a civil action, Rule 25 (a) of the Federal Rules of Civil Procedure permits the court to substitute a proper party in the decedent's place if any non-extinguished claims remain. <u>See</u> Fed. R. Civ. P. 25 (a). But the rule further requires that an action by or against any decedent must be dismissed if a motion to substitute a proper party is not made within 90 days after service of a statement noting the death. <u>Id.</u> Here, well more than 90 days have passed since the parties acknowledged the deaths of Dixon, Higgins, and Lichtenthal in the record and no substitution motions have been filed. Consequently, the actions by Dixon, Higgins, and Lichtenthal will be dismissed under Rule 25 (a).

Second, Defendants maintain that six of the remaining plaintiffs [6]—Brandon, Czech, McDonell, Short, Stowell, and Wise—signed releases at the time of their retirements that now bar their claims. (Memorandum of Law, Docket No. 61-69, pp. 26-28.) Indeed, Czech, McDonell, Short, and Stowell all signed identical "General Release of All Claims" documents, <u>see</u> General Releases, Docket Nos. 61-11, 61-23, 61-31, 61-33, while Wise and presumably Brandon[7] signed similar releases with similar terms, <u>see</u> Wise Release, Docket No. 61-36. But one important term found in both releases—a term not disclosed by Defendants in their Statement of Undisputed Facts (<u>see, e.g.</u>,

---

[6] Defendants also maintain that Dixon and Higgins signed general releases, but for the reasons just stated, their actions will otherwise be dismissed under Rule 25 (a). (Defendants' Statement, ¶¶ 64, 78.)

[7] The release that Brandon signed is not contained in the record, but there is similarly no indication in the record that he signed a release substantially different than the ones the other plaintiffs signed. (Plaintiffs' Supplemental Response to Interrogatories and Document Demands, Docket No. 61-67, p. 26.)

Defendants' Statement, ¶¶ 56, 115, 163, 172, 188)—is that "[t]his agreement does not waive any claims that arise after the date I separate from AAM under this Agreement." (See General Releases, Docket Nos. 61-11, 61-23, 61-31, 61-33; Wise Release, Docket No. 61-36.) Since the claims herein all arose after these plaintiffs separated from American Axle, these releases by their plain terms do not bar their claims. Consequently, Defendants are not entitled to summary judgment against these plaintiffs on this basis.

With these two issues resolved, this Court moves to Plaintiffs' causes of action.

## A. General Legal Principles

### 1. Summary Judgment

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56 (a). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). An issue of material fact is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

In deciding a motion for summary judgment, the evidence and the inferences drawn from the evidence must be "viewed in the light most favorable to the party opposing the motion." Addickes v. S.H. Kress & Co., 398 U.S. 144, 158-59, 90 S. Ct.1598, 26 L. Ed. 2d 142 (1970). "Only when reasonable minds could not differ as to the import of evidence is summary judgment proper." Bryant v. Maffucci, 923 F.2d 979, 982 (2d Cir. 1991). Indeed, "[i]f, as to the issue on which summary judgment is sought, there is any

evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." Sec. Ins. Co. of Hartford v. Old Dominion Freight Line, Inc., 391 F.3d 77, 82–83 (2d Cir. 2004) (citations omitted).

But a "mere scintilla of evidence" in favor of the nonmoving party will not defeat summary judgment. Anderson, 477 U.S. at 252. A nonmoving party must do more than cast a "metaphysical doubt" as to the material facts, Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986); it must "offer some hard evidence showing that its version of the events is not wholly fanciful," D'Amico v. City of N.Y., 132 F.3d 145, 149 (2d Cir. 1998). That is, there must be evidence from which the jury could reasonably find for the nonmoving party. Anderson, 477 U.S. at 252.

In the end, the function of the court at the summary judgment stage is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "Assessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." Rule v. Brine, Inc., 85 F.3d 1002, 1011 (2d Cir. 1996).

This same standard applies to cross motions for summary judgment. See Morales v. Quintel Entm't, Inc., 249 F.3d 115, 121 (2d Cir. 2001). "[W]hen both parties move for summary judgment, asserting the absence of any genuine issues of material fact, a court need not enter judgment for either party. Rather, each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." Id. (citing Heublein, Inc. v.

United States, 996 F.2d 1455, 1461 (2d Cir. 1993); Schwabenbauer v. Bd. of Educ., 667 F.2d 305, 314 (2d Cir. 1981)).

## 2. Standard of Review

"A denial of benefits challenged under [29 U.S.C.] § 1132 (a)(1)(B) is to be reviewed under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Firestone Tire & Rubber Co. v. Bruch, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989); see Muller v. First Unum Life Ins. Co., 341 F.3d 119, 123-24 (2d Cir. 2003). If the benefit plan vests the administrator or fiduciary with such discretionary authority, the denial of benefits is subject to a deferential "arbitrary and capricious" standard of review. See Celardo v. GNY Auto. Dealers Health & Welfare Trust, 318 F.3d 142, 145 (2d Cir. 2003): Burke v. Kodak Ret. Income Plan, 336 F.3d 103, 109 (2d Cir. 2003); Pagan v. Nynex Pension Plan, 52 F.3d 438, 441 (2d Cir. 1995) ("where the written plan documents confer upon a plan administrator the discretionary authority to determine eligibility, we will not disturb the administrator's ultimate conclusion unless it is 'arbitrary and capricious'"). "Language that confers discretionary authority must be clear, as '[a]mbiguities are construed in favor of the plan beneficiary.'" Thoma v. Fox Long Term Disability Plan, 17 Civ. 4389, 2018 WL 6514757, at *25 (S.D.N.Y. Dec. 11, 2018) (quoting Krauss v. Oxford Health Plans, Inc., 517 F.3d 614, 622 (2d Cir. 2008)).

Judicial review under this standard is narrow. See Celardo, 318 F.3d at 146. A decision to deny benefits "may be overturned only if the decision is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" Kinstler v. First

Reliance Standard Life Ins. Co., 181 F.3d 243, 249 (2d Cir. 1999) (quoting Pagan, 52 F.3d at 442). Reasonable interpretations by the plan administrator must be upheld. See Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst., 46 F.3d 1264, 1271 (2d Cir. 1995). "Where both the [plan administrator] and a rejected applicant offer rational, though conflicting, interpretations of plan provisions, the [plan administrator's] interpretation must be allowed to control." Miles v. New York State Teamsters Conference Pension & Ret. Fund Emp. Pension Benefit Plan, 698 F.2d 593, 601 (2d Cir. 1983). In other words, courts "are not free to substitute [their] own judgment for that of the [plan administrator] as if [they] were considering the issue of eligibility anew." Pagan, 52 F.3d at 442. Substantial evidence is "such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [decisionmaker and] . . . requires more than a scintilla but less than a preponderance" of evidence. Miller v. United Welfare Fund, 72 F.3d 1066, 1072 (2d Cir. 1995) (quoting Sandoval v. Aetna Life & Cas. Ins. Co., 967 F.2d 377, 382 (10th Cir. 1992)). The plan administrator carries the burden of proving that the deferential standard of review applies. See Fay v. Oxford Health Plan, 287 F.3d 96, 104 (2d Cir. 2002).

Here, the Plan vests the MBC with

> discretionary authority to determine all questions arising in the administration, application and interpretation of the Plan including the authority to correct any defect or reconcile any inconsistency or ambiguity in the Plan and the authority to determine a Participant's, beneficiary's or other individual's right to participate in the Plan, eligibility to receive a benefit from the Plan, and the amount of that benefit.

(Defendants' Statement, ¶ 4; Plaintiffs' Response, ¶ 4; Plaintiffs' Statement, ¶ 22;

15

Defendants' Response, ¶ 22.)

Notwithstanding this language, Plaintiffs first argue that *de novo* review should apply because Defendants operated under a conflict of interest by both administering and funding the Plan. Plaintiffs are wrong for two reasons.

First, the existence of a structural conflict of interest does not change the standard of review; rather, it is a factor to be considered when applying the arbitrary and capricious standard. See <u>Metro. Life Ins. Co. v. Glenn</u>, 554 U.S. 105, 115, 128 S. Ct. 2343, 171 L. Ed. 2d 299 (2008) (rejecting the argument that a conflict of interest changes the standard of review from deferential to *de novo*, reiterating that "a conflict should 'be weighed as a 'factor in determining whether there is an abuse of discretion''") (quoting <u>Firestone</u>, 489 U.S. at 115, in turn quoting Restatement § 187, Comment d; (alteration omitted)); <u>McCauley v. First Unum Life Ins. Co.</u>, 551 F.3d 126, 133 (2d Cir. 2008) ("a plan under which an administrator both evaluates and pays benefits claims creates the kind of conflict of interest that courts must take into account and weigh as a factor in determining whether there was an abuse of discretion but does not make *de novo* review appropriate").

Second, such a conflict of interest is given weight only if it actually affected an administrator's decision-making. See <u>Durakovic v. Bldg. Serv. 32 BJ Pension Fund</u>, 609 F.3d 133, 140 (2d Cir. 2010) (explaining that "[n]o weight is given to a conflict in the absence of any evidence that the conflict actually affected the administrator's decision"). Here, Plaintiffs have presented no evidence from which it could be reasonably concluded that the structural conflict of interest actually affected Defendants' decision-making. See <u>Roganti v. Metro. Life Ins. Co.</u>, 786 F.3d 201, 218 (2d Cir. 2015) (noting that plaintiff

carries the burden of demonstrating that the conflict of interest actually affected the administrator's decision-making).

But Plaintiffs also argue that *de novo* review should apply because Defendants failed to comply with ERISA's procedural regulations. On this point, Plaintiffs are correct. In <u>Halo v. Yale Health Plan</u>, the Second Circuit held that "a plan's failure to establish or follow the claims-procedure regulation, 29 C.F.R. § 2560.503-1, will result in that claim being reviewed *de novo* in federal court, unless the plan has otherwise established procedures in full conformity with the regulation and can show that its failure to comply with the claims-procedure regulation in the processing of a particular claim was inadvertent *and* harmless." 819 F.3d 42, 58 (2d Cir. 2016) (emphasis in original). The Plan bears the burden of proof on this point. <u>Id.</u>

Plaintiffs maintain that Defendants failed to comply with 29 C.F.R. § 2560.503-1 (j), which requires, *inter alia*, that written or electronic notification of an adverse benefit determination include (1) the specific reason for the adverse determination, (2) a reference to the specific plan provision upon which the determination is based, (3) notice that the claimant is entitled to free access to all information relevant to his or her claim, and (4) a statement describing the plaintiff's appeal rights and options. <u>See</u> 29 C.F.R. § 2560.503-1 (j)(1)-(4). These basic provisions are also incorporated into the Plan in § 8.9 (b).

Indeed, it is undisputed that the letters Elizabeth Main sent to Plaintiffs on the Plan's behalf did not comply with the governing regulation or relevant provisions of § 8.9 (b) of the Plan. That is, the letters did not contain notice of the following information,

17

written in a manner calculated to be understood by the claimants:

> (1) the specific reason or reasons for denial;
>
> (2) specific reference to pertinent Plan provisions on which the denial is based;
>
> (3) a description of any additional material or information necessary for the claimant to perfect the claim and an explanation of why such material or information is necessary;
>
> (4) an explanation of the Plan's claim review procedures and the time limits applicable to such procedures including a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to and copies of, all documents, records and other information relevant to the claimant's claim for benefits;
>
> (5) a statement of the claimant's right to bring a civil action under Section 502 (a) of the [ERISA] following an adverse benefit determination on review
>
> . . .

(Plaintiffs' Statement, ¶ 37; Defendants' Response, ¶ 37; Plan, Docket No. 61-5, p. 14.)

Under <u>Halo</u>, the question now becomes whether the Plan can show that its failure to comply with 29 C.F.R. § 2560.503-1 (j)(1)-(4) was "inadvertent *and* harmless." 819 F.3d at 58 (emphasis in original). It cannot. Elizabeth Main admitted at her deposition that she purposefully omitted certain information required by 29 C.F.R. § 2560.503-1 (j)(1)-(4) and § 8.9 (b) of the Plan to keep the letters "short and succinct and to one page . . . [because] [p]eople tend to read things if it's only one page." (Main Dep., Docket No. 62-4, pp. 84, 86.) The omission of this information was therefore intentional, not inadvertent. That is, Main intentionally omitted the information required under the regulation so that the letters would not exceed one page. In light of this uncontested

18

admission, examination of whether the omission was harmless is not required.   Under

Halo, *de novo* review applies.[8]   See Halo, 819 F.3d at 58.

*De novo* review "applies to all aspects of the denial of an ERISA claim, including

fact issues."   Kinstler, 181 F.3d at 245.   The court affords no deference to the insurer's

interpretation of the plan documents, its analysis of the record, or its conclusions

regarding the merits of the claim.   McDonnell v. First Unum Life Ins. Co., No. 10 CV 8140

(RPP), 2013 WL 3975941, at *12 (S.D.N.Y. Aug. 5, 2013).   Rather, the court "stands in

the shoes of the original decisionmaker."   Dimaria v. First Unum Life Ins. Co., No. 01 CV

11413, 2005 WL 743324, at *4 (S.D.N.Y. Mar. 31, 2005).   It "interprets the terms of the

benefits plan, determines the proper diagnostic criteria, reviews the medical evidence,

and reaches its own conclusion about whether the plaintiff has shown, by a

preponderance of the evidence, that she is entitled to benefits under the plan."

McDonnell, 2013 WL 3975941, at *12 (citations omitted).   The court must "review the

Plan as a whole, giving terms their plain meanings."   Fay, 287 F.3d at 104.

---

8 Defendants seemingly argue that Main's conduct was inadvertent because she did not act with a
nefarious purpose.   (See Memorandum of Law, Docket No. 72, p. 4 (arguing that because the purpose of
the omission was to keep the letter to a single page—"no other reason"—"[t]he failure to include the claims
appeal process in the letter sent to plaintiffs was not intentional and was, very simply, inadvertent.")   In
other words, Defendants seem to argue that because Main did not act intentionally to deny Plaintiffs the
required information, her actions were inadvertent.   This flatly misunderstands the concept of
inadvertence, which the Oxford dictionary defines simply as "not resulting from or achieved through
deliberate planning."   See https://en.oxforddictionaries.com/definition/inadvertent.   And it finds no support
in Halo, which does not discuss inadvertence in the context of a nefarious purpose.   Here, Main admitted
that she deliberately omitted the required information to keep the letters to a single page.   By definition
then, her actions were not inadvertent.

## B. ERISA Claim

Plaintiffs seek to recover the pension payments that Defendants withheld under the "Deductions for Workers Compensation" provision of the Plan pursuant to 29 U.S.C. § 1132 (a)(1)(B), which provides that a participant or beneficiary may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the terms of the plan."

Both sides agree that Plaintiffs' claim turns on the meaning of the "Deductions for Workers Compensation" provision of the Plan. That provision again provides as follows:

> **Deductions for Workers Compensation**. In determining the monthly benefits payable under this Plan, a deduction shall be made unless prohibited by law, equivalent to all or any part of Workers Compensation (including compromise or redemption settlements) payable to such associate by reason of any law of the United States, or any political subdivision thereof, which has been or shall be enacted, provided that such deductions shall be to the extent that such Workers Compensation has been provided by premiums, taxes or other payments paid by or at the expense of the Corporation, except that no deduction shall be made for the following:
>
> (a) Workers Compensation payments specifically allocated for hospitalization or medical expenses, fixed statutory payments for the loss of any bodily member, or 100% loss of use of any bodily member, or payments for loss of industrial vision.
>
> (b) Compromise or redemption settlements payable prior to the date monthly pension benefits first become payable.
>
> (c) Workers Compensation payments paid under a claim filed not later than two years after the breaking of seniority.

(Defendants' Statement, ¶ 8.)

At issue is subsection (c).   Plaintiffs contend that the language of subsection (c) is plain and unambiguous.   They argue that on its face, subsection (c) provides that no deductions will apply for workers' compensation payments received from claims filed earlier than two years after a participant retires or otherwise breaks seniority.   That is, two years after the breaking of seniority is a cut-off date: claims filed before that date are not subject to deductions; claims filed after that date are.   Necessarily then, no deduction can be taken for workers' compensation payments received from a claim filed *before* the breaking of seniority (<u>e.g.</u>, before retirement), because a claim filed *before* the breaking of seniority is indisputably filed earlier than two years *after* the breaking of seniority.

Defendants are not convinced.   They contend that the structure of this provision sets forth a general rule with three exceptions.   The general rule requires that workers' compensation payments be deducted from pension payments: "a deduction shall be made."   According to Defendants, the purpose of this rule is to prevent American Axle from double-paying workers' compensation and pension payments: "provided that such deductions shall be to the extent that such Workers Compensation has been provided by premiums, taxes or other payments paid by or at the expense of [American Axle]." Defendants therefore maintain that subsection (c) must be read to except only workers' compensation payments paid under a claim filed after the breaking of seniority but not later than two years after that date.   In other words, the breaking of seniority starts the two-year exception period.   Defendants argue that to read subsection (c) otherwise as Plaintiffs suggest would have the exception swallow the rule.

 "[T]he validity of a claim to benefits under an ERISA plan is likely to turn on the

interpretation of terms in the plan at issue." Firestone, 489 U.S. at 115. ERISA plans are interpreted according to federal common law applying "common-sense canons of contract interpretation." Dillon v. Metro. Life Ins. Co., 832 F. Supp. 2d 355, 365 (S.D.N.Y. 2011) (quoting Loughman v. Unum Provident Corp., 536 F. Supp. 2d 371, 375 (S.D.N.Y. 2008)); see also In Re DeRogatis, 904 F.3d 174, 187 (2d Cir. 2018); Masella v. Blue Cross & Blue Shield of Conn., Inc., 936 F.2d 98, 107 (2d Cir. 1991). They are reviewed as a whole, with terms given their plain meanings. See Fay, 287 F.3d at 104 (citing Brass v. Am. Film Techs., Inc., 987 F.2d 142, 148 (2d Cir. 1993) ("Where the [contract] language is plain and unambiguous, a court may construe the contract and grant summary judgment.") and Bradwell v. GAF Corp., 954 F.2d 798, 800 (2d Cir. 1992) ("In construing the policy, we look to the language of the policy and other indicia of the intent of the policy's creator.")). And courts are to "interpret ERISA plans in an ordinary and popular sense as would a person of average intelligence and experience." Critchlow v. First Unum Life Ins. Co. of Am., 378 F.3d 246, 256 (2d Cir. 2004) (quoting Todd v. AIG Life Ins. Co., 47 F.3d 1448, 1452 n.1 (5th Cir. 1995)).

"Whether contract language is ambiguous is a question of law that is resolved by reference to the contract alone." O'Neil v. Ret. Plan for Salaried Emps. of RKO Gen., Inc., 37 F.3d 55, 58-59 (2d Cir. 1994). "[U]nambiguous language in an ERISA plan must be interpreted and enforced in accordance with its plain meaning." Aramony v. United Way Replacement Benefit Plan, 191 F.3d 140, 149 (2d Cir. 1999). Where ambiguities in the plan language are found on *de novo* review, they are construed in favor of the plan beneficiary. See Masella, 936 F.2d at 107; Lifson v. INA Life Ins. Co. of New York, 333

F.3d 349, 353 (2d Cir. 2003) ("Terms in the Plan must be construed in accordance with the reasonable expectations of the insured."); Browe v. CTC Corp., 331 F. Supp. 3d 263, 302-303 (D.Vt. 2018) (noting that ambiguities in an ERISA plan are construed against its drafter). "Language is ambiguous when it is capable of more than one meaning when viewed objectively by a reasonably intelligent person who has examined the context of the entire . . . agreement." O'Neil, 37 F.3d at 59 (internal quotations and citations omitted). Extrinsic evidence may be considered to clarify any ambiguous terms. See Gibbs ex rel. Estate of Gibbs v. CIGNA Corp., 440 F.3d 571, 579 (2d Cir. 2006). In the end, whether the terms are clear or ambiguous, "the provisions of an ERISA plan should be construed so as to render all provisions meaningful and to avoid illusory promises." Aramony, 191 F.3d at 150 (internal quotations and citations omitted).

Upon consideration of the Plan as a whole and the "Deductions for Workers Compensation" provision in particular, this Court agrees with Plaintiffs that the language of the provision is plain and unambiguous. Subsection (c) excepts "Workers Compensation payments paid under a claim filed not later than two years after the breaking of seniority" from the general rule that workers' compensation payments must be deducted from pension payments under the Plan. This exception is triggered by the timing of the workers' compensation claim, not the timing of the benefits received therefrom. In that regard, the provision clearly sets a single cut-off date for the claim: "two years after the breaking of seniority." Workers' compensation payments received from claims filed before that date are not deducted; workers' compensation payments received from claims filed after that date are. This is the ordinary and popular

understanding that a person of average intelligence and experience would reach. See Critchlow, 378 F.3d at 256.

Contrary to Defendants' argument, subsection (c) does not set forth an exception period with defined start and end dates. Defendants' construction—that subsection (c) sets a start date at the breaking of seniority and an end date at two years thereafter— requires reading into the provision terms that are simply not there. Subsection (c) does not read "Workers Compensation payments paid under a claim filed *after the breaking of seniority but* not later than two years *thereafter.*" This language would reflect the construction that Defendants advocate. But that is not how subsection (c) reads. It defines the exception period for filed workers' compensation claims as any time earlier than two years after the breaking of seniority: "a claim filed not later than two years after the breaking of seniority." As such, it would include any workers' compensation claims filed before an individual's breaking of seniority or retirement.

Moreover, the plain language does not contravene what Defendants represent to be the purpose of the provision: to eliminate double-paying. This cannot be the sole purpose, because Defendants themselves concede that even under their construction, American Axle would double-pay if a participant filed a workers' compensation claim between the date he or she broke seniority and the date two years later. (Memorandum of Law, Docket No. 61-69, p. 24.) Thus, an exception period wherein double payment would occur is inherent in the provision.

So too, the exception in subsection (c) does not swallow the rule, because workers' compensation payments received from claims filed later than two years after breaking

24

seniority must be deducted from pension payments due under the Plan according to the general rule, thereby giving effect to both the general rule and the subsection (c) exception. While Defendants argue that no such workers' compensation payments would ever be received because there is a two-year statute of limitations on workplace-accident claims in New York, see Memorandum of Law, Docket No. 66, p. 24, nothing in the Plan supports the application of New York workers' compensation law to construe its terms. Even so, workplace accidents are not the only type of injuries for which workers can be compensated. As Plaintiffs note, other provisions of New York Workers' Compensation Law, such as those applicable to disablement claims, are not constrained by a two-year statute of limitations. See New York Workers' Compensation Law § 28 (addressing "disablement").

This Court therefore finds that the language of subsection (c) is unambiguous and must be given its plain meaning, as set forth above. See Fay, 287 F.3d at 104; Aramony, 191 F.3d at 149. As Plaintiffs put it, "[a] natural and unforced reading of [subsection (c)] communicates that as long as a workers compensation claim is filed earlier than two years after retirement, payments made pursuant to such a claim shall not cause a participant's pension benefit to be offset or reduced." (Memorandum of Law, Docket No. 65, p. 2.)

But even if subsection (c) could be read as ambiguous, any ambiguity must be resolved in Plaintiffs' favor. See Masella, 936 F.2d at 107. Ambiguous terms must be construed according to the reasonable expectations of the beneficiary, which based on the past administration of this provision, favors the interpretation above. See Lifson, 333 F.3d at 353.

As reflected in the Memorandum of Understanding that American Axle, GM, and the UAW entered on April 27, 1994 ("the 1994 MOU") when American Axle purchased GM's plants, the intent of the parties was that the benefits of those employees transferring from GM to American Axle would remain the same.[9]  (Plaintiffs' Statement, ¶¶ 4, 7; Defendants' Response, ¶¶ 4, 7; Deposition of Preston M. Crabill ("Crabill Dep."), Docket No. 62-4, pp. 31, 36, 66.)   The GM Plan contained the same workers' compensation deduction provision at issue here, which GM interpreted and administered consistent with this Court's findings above.   (Plaintiffs' Statement, ¶¶ 25, 26; Defendants' Response, ¶¶ 25, 26; Main Dep., Docket No. 62-4, pp. 79-80 (the American Axle plan was "a mirror plan of the General Motors plan").)

As GM's Director of Pension and Savings Plans Preston M. Crabill testified and explained in an email:

> The key determination here is the date for the filing of the claim.  If the claim was filed not later than two years after breaking of seniority, such as retirement, then we do not make deductions from pension benefits for workers compensation payable.  The language does not tie to the resolution of the claim, lump sum settlements, etc.  In your example below, the claim was filed prior to retirement.  Therefore, the pension benefits are not reduced.

(Crabill Email, Docket No. 62-6, p. 4; Crabill Dep, Docket No. 62-4, pp. 2-9.)

GM administered its plan in line with this interpretation for more than 40 years and continues to do so.  (Crabill Dep., Docket No. 62-4, p. 9.)   And American Axle administered its Plan the same way until 2006, when it reduced Wise's pension payments. Yet even after Wise's case, American Axle continued to pay the other plaintiffs full pension

---

9  A copy of the 1994 MOU is contained in the record at Docket Number 62-3, pp. 85-98.

benefits without offset until the 2009 audit, despite their continued receipt of workers' compensation payments. (Deposition of Karen Cimafranca, Docket No. 62-4, pp. 64-65.) Defendants offer no explanation for their changed interpretation of subsection (c) as reflected in Wise's case, or for their subsequent inconsistent interpretation and application of subsection (c) between 2006 and 2009.

Put simply, until Defendants' change in interpretation, the Plan participants' settled expectations were that no deductions to their pension payments would be made for payments from workers' compensation claims filed anytime earlier than two years after their retirement, including before their retirement. Consequently, even if the language in subsection (c) could be viewed as ambiguous, it must be construed in Plaintiffs' favor.

Accordingly, this Court finds that Plaintiffs are entitled to summary judgment on their ERISA claim and that Defendants are not. Defendants must pay Plaintiffs the full benefits to which they are entitled under the Plan (retroactive and prospective) without deduction for workers' compensation payments, consistent with this Court's articulation of the Plan's plain meaning above, together with prejudgment interest at the rate of 9% per annum, as provided in NY CPLR § 5004.[10] See, e.g., Rood v. New York State Teamsters Conference Pension & Retirement Fund, 39 F. Supp. 3d 241, 254 (N.D.N.Y. 2014) (applying 9% rate under NY CPLR § 5004) (collecting cases).

---

[10] This Court finds that the factors relevant to whether prejudgment interest should be awarded all counsel in favor of such an award: "(i) the need to fully compensate the wronged party for actual damages suffered, (ii) considerations of fairness and the relative equities of the award, (iii) the remedial purpose of the statute involved, and/or (iv) such other general principles as are deemed relevant by the court." Jones v. UNUM Life Ins. Co. of Am., 223 F.3d 130, 139-40 (2d Cir. 2000) (quoting SEC v. First Jersey Sec., Inc., 101 F.3d 1450, 1476 (2d Cir. 1996)).

**C. Promissory Estoppel Claim**

Plaintiffs allege a promissory estoppel claim under ERISA premised on the terms of the 1994 MOU.   (Corrected Complaint, ¶ 34.)

Despite ERISA's preemption provision—ERISA preempts "any and all State laws insofar as they may now or hereafter relate to any employee benefit plan," 29 U.S.C. § 1144 (a)—principles of estoppel may apply in extraordinary circumstances in ERISA cases under federal common law.[11]   See Lee v. Burkhart, 991 F.2d 1004, 1009 (2d Cir. 1993) (citing Chambless v. Masters, Mates & Pilots Pension Plan, 772 F.2d 1032, 1039 (2d Cir. 1985)).   "To avoid preemption, [a] [p]laintiff must satisfy the common law elements of estoppel and establish that extraordinary circumstances exist."   Patterson v. J.P. Morgan Chase & Co., No. 01 CIV 7513 (JSM), 2002 WL 207123, at *5 (S.D.N.Y. Feb. 11, 2002) (citing Devlin v. Transp. Commc'ns Int'l Union, 173 F.3d 94, 102 (2d Cir. 1999)).   State law does not control.   See Devlin v. Empire Blue Cross & Blue Shield, 274 F.3d 76, 85 n. 5 (2d Cir. 2001) (noting that "general common law principles apply").

Promissory estoppel in ERISA cases requires the establishment of five elements: (1) a promise; (2) reliance on that promise; (3) injury caused by the reliance; (4) injustice if the promise is not enforced; and (5) extraordinary circumstances.   See Egan v. Marsh & McLennan Cos., Inc., No. 07 Civ. 7134, 2008 WL 245511, at *5 (S.D.N.Y. Jan. 30, 2008) (quoting Abbruscato v. Empire Blue Cross & Blue Shield, 274 F.3d 90, 100-01 (2d Cir. 2001), in turn quoting Aramony, 191 F.3d at 151); see also Weinreb v. Hosp. for Joint

---

11 Straight state law promissory estoppel claims, however, are preempted.   See, e.g., Colon v. Guthrie Clinic, Ltd., No. 06-CV-6527, 2008 WL 686268, at *2 (W.D.N.Y. Mar. 7, 2008) ("As a matter of law all state common law claims of promissory estoppel, breach of contract, or fraud are preempted by ERISA.").

Diseases Orthopaedic Inst., 404 F.3d 167, 172 (2d Cir. 2005). The Second Circuit added the fifth element—extraordinary circumstances—to minimize "the danger that commonplace communications from employer to employee will routinely give rise to employees' rights beyond those contained in formal benefit plans." Aromony, 191 F.3d at 151.

Extraordinary circumstances must involve intentional inducement or deception that inures to the defendant's benefit, such as "a promise made with the intention of inducing action or forbearance by plaintiff, which induced action or forbearance inures to the benefit of the defendant, and the defendant later reneges on the promise." Turcotte v. Blue Cross & Blue Shield of Mass., Inc., No. 07 Civ. 4023, 2008 WL 4615903 (S.D.N.Y. Oct. 13, 2008); Long Island Neuroscience Specialists v. Fringe Benefits Funds Local 14-14 Int'l Union of Operating Eng'rs, 17-3341 (JMA)(ARL), 2018 WL 3912283, at *5 (E.D.N.Y. July 31, 2018); see also Schonholz v. Long Island Jewish Med. Ctr., 87 F.3d 72, 77 (2d Cir. 1996) (extraordinary circumstances where defendant's promise of severance benefits induced the plaintiff's retirement); Abbruscato, 274 F.3d at 101-02 (extraordinary circumstances where promise of benefits induced the plaintiffs' to retire). One panel of the Second Circuit has described "extraordinary circumstances" as requiring "conduct tantamount to fraud." Greifenberger v. Hartford Life Ins. Co., 131 Fed.Appx 756, 759 (2d Cir. 2005) (citing Devlin, 173 F.3d at 101-02).[12] It is the requirement that the inducement or forbearance inure to the defendant's benefit that separates extraordinary circumstances from the reliance element. See, e.g., Turcotte, 2008 WL

_____

12 Summary orders, of course, do not have precedential effect. See Local Rule 32.1.1 of the Local Rules and Internal Operating Procedures of the Court of Appeals for the Second Circuit.

4615903, at *8 ("the Court is not persuaded that a mere promise that induces action, without the inuring of benefit to the defendant, is sufficient to allege extraordinary circumstances").

Plaintiffs maintain that American Axle promised in the 1994 MOU to establish a new defined benefit plan containing terms identical to, and benefits equal to, the terms and benefits of the GM plan. (Corrected Complaint, ¶ 218.) The provision they rely on is as follow:

> GM's contract with [American Axle] will provide that [American Axle] will establish a new defined benefit pension plan (hereinafter referred to as the "Replacement Pension Plan"), effective as of the Effective Date of Sale, covering all transferred employees which, consistent with [American Axle's] obligations under the [American Axle]-UAW Agreement, will contain terms identical to the GM Pension Plan except for those provisions required to be changed as a result of a new Plan sponsor and the provisions addressed in this Memorandum. The intent of the parties is to provide transferred employees with benefits from the Replacement Plan and the GM Plan which, apart from any difference that may result from future bargaining, in aggregate, will equal the benefits that would have been provided had the sale not occurred and the employees had continued working for GM.

(1994 MOU, Docket No. 62-3, pp. 88.)

Plaintiffs further allege that under the GM plan, a deduction for workers' compensation payments received was made only for such payments received from workers' compensation claims made later than two years after retirement. (Corrected Complaint, ¶¶ 220, 221.) Thus, by offsetting Plaintiffs' pension payments by their workers' compensation payments received from workers' compensation claims filed before retirement, Defendants' breached this promise.

30

Defendants move for summary judgment on the basis that Plaintiffs cannot establish the required elements of a promissory estoppel claim. First, they maintain that the 1994 MOU was "an agreement to agree" that did not contain any enforceable promises. Second, they argue that even if the 1994 MOU contained an enforceable promise, there is no evidence that any of the plaintiffs knew about or relied on that promise. Finally, they contend that Plaintiffs cannot establish the existence of extraordinary circumstances. Plaintiffs' oppose Defendants' motion and advocate the opposite position: that they are entitled to summary judgment because they have established each of the five required elements of a promissory estoppel claim.

Having reviewed the parties' arguments and the record, this Court finds that Defendants are entitled to summary judgment on Plaintiffs' promissory estoppel claim and that Plaintiffs are not.

Plaintiffs' promissory estoppel claim is premised on the written 1994 MOU provision set forth above, which by its plain terms covers only "transferred employees"—those transferring at that time from GM's to American Axle's employ. (1994 MOU, Docket No. 62-3, pp. 88.) Thus, it covers only Bellere, Brandon, Czech, Glover, Jaroszewski, LoGrasso, McDonell, Schalberg, Short, and Wise. (Defendants' Statement, ¶¶ 23, 32, 50, 68, 82, 101, 111, 147, 158, and 184.)

Plaintiffs' promissory estoppel claim suffers from two fatal flaws. First, even assuming that the provision at issue in the written 1994 MOU constituted an enforceable promise, there is insufficient evidence from which a trier of fact could conclude that any plaintiff relied on that promise. Plaintiffs have come forth with no evidence at all that any

plaintiff ever saw, was familiar with, or relied on the written 1994 MOU. In fact, Plaintiffs Bellere, Brandon, Glover, and LoGrasso specifically admit that they never saw it. (Defendants' Statement, ¶¶ 25, 34, 69, 102.) Thus, even assuming that the written 1994 MOU created an enforceable promise, Plaintiffs cannot establish that any plaintiff reviewed and relied on that promise.

The best Plaintiffs can muster is that some of the transferred plaintiffs attended a meeting in early 1994 where they may have been told by an unidentified individual that their benefits would not change (see Defendants' Statement, ¶¶ 52,159) and that both transferred and non-transferred plaintiffs developed "an understanding" from what they heard or were told that the benefits at American Axle would be the same as they were at GM (see Plaintiffs' Affidavits, Docket Nos. 65-3—65-17, 65-19—65-21). But even assuming that these statements were actually made and constituted promises, "oral promises are unenforceable under ERISA and therefore cannot vary the terms of an ERISA plan." Perreca v. Gluck, 295 F.3d 215, 225 (2d Cir. 2002); Ladouceur v. Credit Lyonnais, 584 F.3d 510, 512 (2d Cir. 2009).

Second, Plaintiffs have failed to set forth any evidence from which a trier of fact could reasonably find the existence of extraordinary circumstances. Plaintiffs simply maintain that they relied on American Axle's promise that their benefits would remain unchanged when they continued their employment with American Axle. But the extraordinary circumstances standard requires more than reliance. See Devlin, 173 F.3d at 102 ("[R]eliance is one of the four basic elements of promissory estoppel, and would not by itself render this case 'extraordinary.'").

To demonstrate extraordinary circumstances, Plaintiffs must present evidence "that the employer used the promise to intentionally induce a particular behavior on the plaintiff's part only to renege on that promise after inducing the sought after behavior." Peters v. Windham Cmty. Mem'l Hosp., Inc., 803 F. Supp. 2d 96, 105 (D.Conn. 2011) (quoting Devlin, 173 F.3d at 102). Extraordinary circumstances might include intentionally inducing an employee to retire early, see Schonholz, 87 F.3d at 79-80, or to forgo retirement, see Devlin, 274 F.3d at 87. But here, Plaintiffs simply continued their employment with American Axle, and there is no evidence from which a reasonable trier of fact could conclude that American Axle tricked them or intentionally induced them into doing so to gain some benefit for itself. See, e.g., Turcotte, 2008 WL 4615903, at *8 ("the Court is not persuaded that a mere promise that induces action, without the inuring of benefit to the defendant, is sufficient to allege extraordinary circumstances"). And there is certainly no evidence of conduct amounting to fraud. See Greifenberger, 131 Fed.Appx at 759.

Accordingly, in the absence of sufficient evidence to minimally support Plaintiffs' promissory estoppel claim, Defendants' motion for summary judgment on this cause of action is granted and Plaintiffs' is denied.

### D. Claim Seeking *De Novo* Review

Plaintiffs' third cause of action seeks the application of *de novo* review due to Defendants' failure to provide a reasonable claims procedure as required under ERISA. There is, however, no separate cause of action for the application of a particular standard of review of which this Court is aware, and Plaintiffs do not identify one. Rather, the

standard of review is resolved in conjunction with a substantive ERISA claim. This "claim" is therefore dismissed.

### E. Equitable Relief Claim

In their fourth cause of action, Plaintiffs seek "a declaratory judgment of their rights under the Plan" (Corrected Complaint, ¶ 233) pursuant to 29 U.S.C. § 1132 (a)(3), which permits a plan participant, beneficiary, or fiduciary to bring an action to enjoin any act or practice that violates any ERISA provision or the terms of a plan, or to seek equitable relief to (1) redress ERISA violations, or (2) enforce any ERISA provisions or the terms of a plan. This section is a "catchall" provision that "act[s] as a safety net, offering appropriate equitable relief for injuries caused by violations that § 502 [29 U.S.C. § 1132] does not elsewhere adequately remedy." Varity Corp. v. Howe, 516 U.S. 489, 116 S. Ct. 1065, 134 L. Ed. 2d 130 (1996); see also New York State Psychiatric Ass'n, Inc. v. United Health Grp., 798 F.3d 125, 134 (2d Cir. 2015). Thus, "where Congress elsewhere provided adequate relief for a beneficiary's injury, there will likely be no need for further equitable relief, in which case such relief normally would not be 'appropriate.'" Varity, 516 U.S. at 515.

Here, Plaintiffs seek equitable relief in the form of a declaratory judgment "of their rights under the American Axle Plan" and "concerning rights to future benefits under the American Axle Plan with respect to Article IV, Section 2(c) of the Plan." (Corrected Complaint, ¶ 233 and Wherefore Clause (c).) But this relief is encompassed in their § 1132 (a)(1)(B) claim, where this Court has already enforced and clarified their rights under the Plan. Plaintiffs' separate cause of action for equitable relief under § 1132 (a)(3) must

therefore be dismissed as duplicative of their § 1132 (a)(1)(B) claim.  See, e.g., New York State Psychiatric Ass'n, 798 F.3d at 134 (suggesting that § 1132 (a)(1)(B) claims repackaged as § 1132 (a)(3) claims are subject to dismissal); Frommert v. Conkright, 433 F.3d 254, 269 (2d Cir. 2006) (finding that a recalculation of benefits consistent with the terms of a plan "falls comfortably" within the scope of [§ 1132 (a)(1)(B)]); Elizabeth W. v. Empire Healthchoice Assurance, Inc., No. 15 Civ. 5250 (CM), 2016 WL 5115496, at *17 (S.D.N.Y. Sept. 15, 2016) (granting summary judgment to defendant where plaintiff's § 1132 (a)(3) claim sought relief available under § 1132 (a)(1)(B)).

### F. Attorney's Fees

ERISA is a fee-shifting statute: a court may allow a reasonable attorney's fee and costs of action for either party.  See 29 U.S.C. § 1132 (g)(1).  Congress intended this provision to encourage beneficiaries to enforce their statutory rights.  See Donachie v. Liberty Life Assur. Co. of Boston, 745 F.3d 41, 45-46 (2d Cir. 2014) (internal quotations omitted).  Thus, awarding a prevailing party attorney's fees and costs is appropriate unless there is good reason not to.  See id. at 47 (citing Birmingham v. SoGen-Swiss Int'l Corp. Ret. Plan, 718 F.2d 515, 523 (2d Cir. 1983)).

Plaintiffs demand attorney's fees and costs in their corrected complaint.  (See Corrected Complaint, Wherefore Clause (d).)  And while there appears no reason to deny their request, the parties have not briefed the issue.  Accordingly, this Court will entertain a motion for attorney's fees and costs from Plaintiffs filed within 30 days of the entry date of this Decision and Order.   Such motion shall include the amount of attorney's fees and costs sought, together with all supporting documentation.

## IV. CONCLUSION

For the reasons stated above, the parties' cross motions for summary judgment are each granted in part and denied in part. Plaintiffs' motion is granted as to their first cause of action and denied in all other respects. Defendants' motion is granted as to Plaintiffs' second, third, and fourth causes of action and denied in all other respects. Defendants must pay Plaintiffs the full benefits to which they are entitled under the Plan (retroactive and prospective) without reduction for workers' compensation payments received, consistent with this Court's articulation of the Plan's plain meaning herein, together with prejudgment interest at the rate of 9% per annum.

## V.  ORDERS

IT HEREBY IS ORDERED, that Plaintiffs' motion for summary judgment (Docket No. 62) is GRANTED in part and DENIED in part, consistent with the foregoing decision.

FURTHER, that Defendants' motion for summary judgment (Docket No. 61) is GRANTED in part and DENIED in part, consistent with the foregoing decision.

FURTHER, that the actions brought by Gerald Dixon, Patrick Higgins, and Donna Lichtenthal are DISMISSED under Rule 25 (a) of the Federal Rules of Civil Procedure.

FURTHER, that it is hereby DECLARED that subsection (c) of the "Deductions for Workers Compensation" provision of the Plan provides that no deductions may be applied to pension payments due under the Plan for workers' compensation payments received from workers' compensation claims filed earlier than the date falling two years after a participant breaks seniority, as more fully explained herein.

FURTHER, that Defendants calculate Plaintiffs' pension payments consistent with

36

this Decision and Order and pay Plaintiffs the full benefits to which they are entitled under the Plan (retroactive and prospective), together with prejudgment interest at the rate of 9% per annum.

FURTHER, that Plaintiffs must file any motion for attorney's fees under 29 U.S.C. § 1132 (g)(1) within 30 days of the entry date of this Decision and Order. Defendants must file their response thereto within 14 days of the filing date of Plaintiffs' motion. Plaintiffs may file a reply within 7 days of the filing date of Defendants' response. This Court will thereafter take the motion under advisement without oral argument.

FURTHER, that the Clerk of Court enter judgment consistent with this Decision and Order and then CLOSE this case.

SO ORDERED.


Dated:   March 11, 2019
         Buffalo, New York

                                            /s/William M. Skretny
                                             WILLIAM M. SKRETNY
                                            United States District Judge